# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MICHAEL W. HILL,         )
                                )
     Petitioner,         )   Civ. Action No. 03-160 (Erie)
                                )
     v.                  )
                                )   Judge McLaughlin
JOHN J. LaMANNA,     )   Magistrate Judge Lenihan
                                )
     Respondent.     )   filed electronically

## RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS

AND NOW, comes Respondent, James Sherman,[1] Warden, FCI McKean ("Respondent"), by his attorneys, Mary Beth Buchanan, United States Attorney for the Western District of Pennsylvania, and Christy Wiegand, Assistant United States Attorney for said district, and for his Response to the Petition for Writ of Habeas Corpus, states the following:

## FACTUAL BACKGROUND

Petitioner, Michael W. Hill, was sentenced by the District of Columbia Superior Court on July 2, 1987, to 4 - 12 years' imprisonment for possession with intent to distribute heroin (Supp. App. 69, Face Sheet). The District of Columbia Board of Parole[2] paroled him on September 28, 1992, to remain under parole supervision until September 1, 1999 (Supp. App. 70, Certificate of Parole).

In August 1994, Petitioner was arrested for murder and taken into custody. On October 4,

---

[1] James Sherman has replaced John LaManna as Warden of FCI McKean, and pursuant to Fed.R.Civ.P. 25(d)(1), is automatically substituted for Mr. LaManna as Respondent in this matter.

[2] The D.C. Board of Parole was abolished effective August 5, 2000 by the National Capital Revitalization and Self-Government Improvement Act of 1997, Public Law No. 105-33, §11231(a)(1), 111 Stat. 712, 745 (effective August 5, 1998); D.C. Code §24-131(b) (formerly 24-1231(b)).

1994, the D.C. Board of Parole lodged a detainer warrant against Petitioner for numerous parole violations on his 1987 drug offense. (Supp. App. 72, Notice of Board Order; Supp. App. 73, District of Columbia Board of Parole Warrant.)

On September 13, 1995, Petitioner pleaded guilty to Manslaughter While Armed and was sentenced to 7 - 21 years' imprisonment. (Supp. App. 74, Sentence Monitoring Computation Data). Following his sentencing, jurisdiction to make parole decisions regarding Petitioner (and all other convicted D.C. felons) was transferred to the United States Parole Commission ("the Commission") pursuant to the National Capital Revitalization and Self-Government Improvement Act of 1997, Public Law No. 105-33, §11231(a)(1), 111 Stat. 712, 745 (effective August 5, 1998); D.C. Code §24-131 (formerly 24-1231) ("Revitalization Act").  Consequently, in all subsequent parole matters Petitioner appeared before the Commission.

The Commission conducted an initial hearing to determine Petitioner's suitability for parole on his 1995 manslaughter sentence on August 8, 2000. (Supp. App. 80, Hearing Summary).  The 1998 version of the parole guidelines was applied.  Due to characteristics of his offense and other factors, Petitioner received a "Total Point Score" of 8, a score which indicated that parole should be denied and a rehearing scheduled within 22-28 months (Supp. App. 83, Notice of Action).  The Commission denied parole and ordered a rehearing in 28 months (April, 2003).  (Supp. App. 83, Notice of Action). Petitioner's parole detainer for violation of the terms of release on his 1987 drug offense remained lodged.

By letter dated March 5, 2003, the Commission informed Petitioner that it would conduct a dispositional revocation hearing (a revocation hearing prior to the execution of the violation warrant) in conjunction with his April, 2003 parole reconsideration hearing. (Supp. App. 87, Letter).  At that

hearing, the Commission would reconsider the granting of parole with respect to the 1995 manslaughter sentence and also resolve whether Petitioner had violated parole on his 1987 narcotics sentence by committing the 1995 manslaughter, and other alleged violations.[3]

The Commission conducted that combined hearing on March 27, 2003. (Supp. App. 89, Combined Dispositional Revocation/Initial Hearing Summary). The Commission found that Petitioner had indeed violated parole on the 1987 offense by committing manslaughter in 1995 (as well as three administrative violations). (Supp. App. 91-92, Combined Dispositional Revocation/ Initial Hearing Summary). The Commission ordered that Petitioner's parole on his drug offense was revoked, that he receive no credit for time spent on parole, and that the unexpired portion of the drug sentence would commence running (i.e., the warrant would be executed) upon his release from his 21-year manslaughter sentence. (Supp. App. 95, Notice of Action). (An Amended Notice of Action was later issued and it included findings of fact that supported the decision to revoke parole on Petitioner's 1987 sentence. (Supp. App. 98, Notice of Action dated April 21, 2003)[4])

On March 27, 2003, the Commission again heard Petitioner's case. This time, the Commission applied the 2000 amended version of 28 C.F.R. §2.80, in accordance with the provisions of that rule. The Commission determined that Petitioner's Total Guideline Range was 185 - 217 months, and that Petitioner had been in custody for 92 months on his manslaughter sentence.[5]

---

[3]  On March 3, 2003, the Commission supplemented the Board's previous warrant with the additional 1995 charge of manslaughter offense (the conduct underlying Petitioner's most recent 1995 conviction) (Supp. App. 85, Supplement). The warrant remained lodged as a detainer (Supp. App. 86, Detainer Notice).

[4]  The notice simply included the findings of fact and evidence that were inadvertently omitted in the original notice (Supp. App. 98, Corrected Notice of Action).

[5]  With respect to the parole suitability determination on Petitioner's manslaughter sentence, the Commission applied its revised 2000 guideline at 28 C.F.R. §2.80 and calculated Petitioner's guideline range as 185 - 217 months (Supp. App. 95, Notice of Action). This range was determined as follows:

The Commission again denied parole, and ordered that Petitioner serve 60 months to a reconsideration hearing in March 2008.

## REGULATORY BACKGROUND

Petitioner's claim arises in the context of the transfer of paroling authority from the D.C. Board of Parole (abolished August 5, 2000) to the U.S. Parole Commission under the 1997 Revitalization Act.  See Franklin v. District of Columbia, 163 F.3d 625, 632 (D.C. Cir. 1998).  The Revitalization Act required the Commission to exercise its authority "pursuant to the parole laws and regulations of the District of Columbia," but also gave the Commission "exclusive authority to amend or supplement any regulation interpreting or implementing the parole laws of the District of Columbia with respect to felons . . . ."  See D.C. Code §24-1231(a)(1) and (c)(1999), recodified as D.C. Code §24-131(a)(1) and (c) (2001).

---

|                         |            |
|-------------------------|------------|
| Base Point Score Guideline Range: | 110-140 |
| Months Required to Serve Parole Eligibility Date | 75--75 |
| Disciplinary Guideline Range | 0---2 |
| Less Superior Program Achievement Award (if applicable) | 0---0 |
| Total Guideline Range | 185-217 mos. |

(App. 97, Notice of Action). The Commission further stated:

> You have been in confinement as a result of your current offense behavior for a total of 92 months as of April 18, 2003.
> After consideration of all factors and information presented, a decision outside the Total Guideline Range at this consideration is not found warranted.

(Supp. App. 95, Notice of Action).   The Commission denied parole on the 1995 manslaughter offense and ordered Petitioner to serve 60 months to reconsideration (Supp. App. 95, Notice of Action). (Determinations regarding computation of sentences of federal prisoners are made by the Federal Bureau of Prisons; the Commission relied on the Bureau's calculation of Petitioner's sentence in determining that he had been in custody 92 months as of April, 2003.)

The guidelines of the D.C. Board of Parole (hereinafter, "1987 guidelines"), which were in effect from 1987 to 1998, are described in detail in Ellis v. District of Columbia, 84 F.3d 1413, 1415-17 (D.C. Cir. 1996). In brief, the 1987 guidelines required the calculation of a "Total Point Score" based on the prisoner's Salient Factor Score and additional risk points. The prisoner's Total Point Score indicated the risk level presented by each prisoner. If the Total Point Score was 2 or less at the initial hearing, the prisoner would be ordinarily be granted parole. If the Total Point Score was 3 or more at the initial hearing, parole would ordinarily be denied and the prisoner would be continued for a rehearing. At rehearings, a score of 3 would indicate that parole should ordinarily be granted. Because points were subtracted from the Total Point Score at rehearings for positive prison programming, a well-behaved prisoner with a high Total Point Score could work his score down to a 3 after one or more rehearings. In the case where parole was denied, the ordinary continuance to a rehearing ("set off") would be one year.

However, the D.C. Parole Board had plenary discretion to override the guidelines and deny parole notwithstanding a favorable Total Point Score, and to order a much longer "set off" than the ordinary one-year requirement. Successive rehearings were no guarantee that parole would be granted. As explained in Ellis v. District of Columbia, 84 F.3d at 1419, ". . . under the regulations, a prisoner with a low total point score shall be granted parole unless the Board, in the exercise of its discretion, believes there is some other reason for not granting him parole." Pursuant to its "amend and supplement" authority, in 1998 the Commission adopted a revised version of the D.C. parole regulations that had been in effect since 1987. See 28 C.F.R. §2.70 (1999) (the Commission's statement of authority for its revisions to the now-superseded rules of the D.C. Board of Parole at 28 D.C.M.R. §100 et seq.).

In its 1998 revisions to this guideline system (hereinafter "1998 guidelines"), the Commission added to the Total Point Score some additional points that reflected the degree of violence in the prisoner's current offense and the number of violent crimes on the prisoner's prior record (the more violence, the higher the score). The Commission also replaced the annual rehearing guideline with specific guideline ranges to be followed in the case of parole denial. However, the Commission maintained the Board's basic guideline for grants and denials of parole (i.e., parole at a rehearing where the point score is 3 points, in the ordinary case), as well as the essential character of the Board's guidelines as a risk-based measure of suitability for parole that applies as soon as a prisoner becomes eligible for parole.

In 2000, the Commission again revised the guidelines (hereinafter, "2000 guidelines").[6] See 28 C.F.R. §2.80 (2001), originally published at 65 Federal Register 70663 (November 27, 2000). The 2000 guidelines maintained the paroling policies expressed in the 1998 guidelines, but converted the rehearing ranges applicable to each prisoner into a Total Guideline Range to guide the Commission's decisions. The Total Guideline Range is based on the point score calculations contained in the 1998 guidelines, plus the number of rehearings a prisoner would normally expect (after completing his minimum term), if he maintained good behavior.[7]

---

[6]  Because the 1998 rule was adopted after July 1, 1998 (the publication date of the annual Code of Federal Regulations volume), it does not appear in the 1998 volume of 28 C.F.R. Similarly, the 2000 amendments do not appear until the 2001 volume of the C.F.R. In the 2001 C.F.R., the older version of the rule appeared in an appendix to §2.80 (see Supp. App. 125-30 (setting out 28 C.F.R. Ch. 1 (7-1-02 Edition)). Later versions of the C.F.R. (2003 forward) omit the Appendix to §2.80, and contain only the 2000 version of the rule. Therefore, citations to the current volume of 28 C.F.R. would not include all relevant regulatory provisions.

For simplicity's sake, citations will therefore be to "28 C.F.R. §2.80 (2001)" (the 2000 version of the rule) and "28 C.F.R. Appendix §2.80 (2001)" (the 1998 version of the rule, moved into the Appendix by the 2000 amendment).

[7]  The Commission explicitly stated in promulgating the rule that:

The revised guidelines convert the rehearing ranges into a single range indicating the total prison time

Petitioner's case illustrates how the Total Guideline Range is calculated. To the amount of time required by the prisoner's minimum term (which remains the punishment component), the Commission adds the applicable rehearing range (or ranges) called for by the prisoner's Total Point Score, plus an additional range of time for any disciplinary infractions (See Supp. App. 97, Notice of Action).

## PROCEDURAL BACKGROUND

Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. §2241 in the United States District Court for the Western District of Pennsylvania on May 12, 2003.[8] In his Petition, Traverse, and a Corrected Supplemental Traverse that followed, Petitioner raised several challenges to the Commission's actions, including an allegation that the Commission improperly determined that he had spent only 92, not 104, months in confinement as of April 18, 2003; that his parole reconsideration date should have been set at three, not five, years from the date of the 2003 parole

---

that may be served by the inmate, and authorize the setting of presumptive release dates up to 36 months from the date of the parole hearing. However, the Point Assignment Table [contained in the prior rules] remains the basis upon which the guidelines are determined. . . . [T]he revised rule contains a presumptive credit for "ordinary program achievement," which currently [i.e., under the prior rule] must be determined on a case-by-case basis, in the guideline range itself. Hence, inmates will now receive the benefit of having their "ordinary program achievement" points credited in advance.

* * *

The [rule] eliminates . . . the system of determining at each hearing (based on the Total Point Score) whether the inmate qualifies for parole at that time. It substitutes the following decisionmaking procedure.

Under Step 1, a Base Guideline Range is determined from the Base Point Score. There is no change from the Base Point Score used in [the previous rule]. The time expected for the inmate to qualify for parole (assuming no disciplinary infractions and ordinary program achievement) is simply made explicit.

65 Fed. Reg. at 70663 (emphasis added).

[8] There is no administrative appeal of denial of parole available to District of Columbia Code offenders, so Petitioner is deemed to have exhausted administrative remedies.

decision; and that the hearing examiner did not discuss with him his offense behavior, among other things.  The Magistrate recommended that the petition be denied, as there was a rational basis for the Commission's findings in the record, and because Petitioner had misconstrued the provisions of the C.F.R.

Challenging the Magistrate's Report and Recommendation, Petitioner raised new claims, arguing that 28 C.F.R. §2.80 (2000) had been retroactively applied to him, in violation of the Ex Post Facto Clause of the Constitution.  Petitioner also challenged the propriety of the hearing examiner's conduct of the hearing.  See Petitioner's Objections to the Report and Recommendation of the U.S. Magistrate. The District Court adopted the Magistrate's Report and Recommendation in a Memorandum Order issued on September 2, 2004 ("Memorandum Order").  Upon reconsideration of Petitioner's filing in opposition, the District Court re-affirmed its adoption of the magistrate's Report and Recommendation. (Order of Court.)  Petitioner then appealed.

The Third Circuit held that "because Petitioner's ex post facto claim was not addressed by the Magistrate Judge or the District Court, and because its merit turns on a fairly complex inquiry into the relationship between the facts of Petitioner's case and the pertinent regulations–an inquiry best made in the first instance by the District Court–we will vacate the District Court's judgment with regard to this claim and remand for further proceedings."  Court of Appeals Opinion, p. 4.  This Court, on remand, ordered Respondent to "file a response addressed to Petitioner's ex post facto claim."  Magistrate Judge's Order of October 24, 2005.

## ISSUE ON REMAND

The issue presented is whether the Commission's application at Petitioner's 2003 hearing of the 2000 amended parole guidelines (hereinafter "2000 guidelines") violated the Ex Post Facto

Clause of the United States Constitution.

Petitioner frames the issue by alleging that application of the 2000 guidelines, rather than the 1998 guidelines, violated the Ex Post Facto Clause. Respondents will address both the claim as framed by Petitioner (comparing the 2000 and 1998 guidelines), and a properly-pled version of an ex post facto claim: that application of the 2000 guidelines rather than the guidelines in effect when he committed his crime (the 1987 D.C. parole guidelines) violated the Ex Post Facto Clause.

## SUMMARY OF THE ARGUMENT

Petitioner's claim that the Commission violated the Ex Post Facto Clause has no merit for four reasons: (1) Petitioner has not pled an ex post facto claim because the 1998 version of C.F.R. §2.80 Petitioner seeks to have applied to his case is not the law annexed to his 1995 crime; (2) under U.S. *ex rel.* Forman v. McCall,[9] the 2000 guidelines are applied with substantial flexibility, and are therefore not "laws" for purposes of the Ex Post Facto Clause; (3) the "substantial flexibility" analysis of Forman is inapplicable to parole guidelines promulgated under the District of Columbia parole statute; and (4) Petitioner has not met, and cannot meet, his burden to demonstrate that application of the 2000 version of §2.80 (2000) created a "risk of increasing the measure of punishment" attached to his crime, whether compared to the 1998 version of the rule or the 1987 guidelines of the D.C. Board of Parole.

## ARGUMENT

### I.     PETITIONER DID NOT PROPERLY PLEAD AN EX POST FACTO CLAIM

#### a.   Ex Post Facto analysis, in general

Petitioner claims that the Commission violated the Ex Post Facto Clause by applying

---

[9] 776 F.2d 1156 (3d Cir. 1985), cert. denied sub nom, Forman v. Baer, 476 U.S. 1119 (1986).

different parole guidelines at his March 2003 hearing (Supp. App. 89, Combined Dispositional Revocation/Initial Hearing Summary) than those applied at his August 2000 initial hearing (Supp. App. 80, D.C. Initial Hearing).[10]  He is implicitly arguing, therefore, that his constitutional entitlement under ex post facto jurisprudence is to application of the 1998 guidelines (i.e., the guidelines applied at his 2000 hearing).  This argument fails to state a claim for relief under ex post facto jurisprudence.    The Ex Post Facto Clause of the Constitution, Article I, Section 9, Clause 3, "prohibits Congress and the states from enacting any law that 'imposes a punishment for an act which is not punishable at the time it was committed; or imposes additional punishment to that then prescribed . . . .'" (citation omitted).  Artez v. Mulcrone, 673 F.2d 1169, 1171 (10th Cir. 1982).  In Collins v. Youngblood, 497 U.S. 37 (1990), the Supreme Court clarified that, to be ex post facto, a law must either punish as a crime an act previously committed, which was innocent when done; make more burdensome the punishment for a crime, after its commission; or deprive one charged with a crime of any defense available when the act was committed.  497 U.S. at 52.  The Court specifically disavowed the notion that the Ex Post Facto Clause applies to "any change which 'alters the situation of a party to his disadvantage.'" 497 U.S. at 50.[11]  As the Court explained in California Department of Corrections v. Morales, 541 U.S. 499 (1995), the Clause is "aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" 541 U.S.

---

[10]  Petitioner did not raise this issue in his initial petition; he raised it for the first time in a traverse to the Government's Response (Supp. App. 40-41, Traverse) and in his objections to the Magistrate's Report and Recommendation (Supp. App. 12-13, Petitioner's Objections to the Report and Recommendation of the U.S. Magistrate). The District Court did not address the issue.

[11]  While the Collins court did not explicitly overrule Weaver, it called into question continued reliance on the criterion of "disadvantage" to a party as sufficient to constitute violation of the *ex post facto* clause.  The Court overruled Kring v. Missouri, 107 U.S. 221 (1882), on the ground that its holding could only be justified if the Clause were understood to include any change which "alters the situation of a party to his disadvantage," 497 U.S. at 50.  The Court stated that "We think such a reading of the Clause departs from the meaning of the Clause as it was understood at the time of the adoption of the Constitution, and is not supported by later cases." Id.

at 504.  Furthermore, the Court stated that:

> After <u>Collins</u>, the focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage,' nor . . . on whether an amendment affects a prisoner's '*opportunity* to take advantage of provisions for early release,'. . . but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable.

541 U.S. at 506, n.3 (emphasis original).

In <u>Garner v. Jones</u>, 529 U.S. 244, 250 (2000), the Court formulated the ex post facto standard as whether the retroactive application of a change in a parole regulation creates "a sufficient risk of increasing the measure of punishment attached to the covered crimes."

### b.  <u>Third Circuit Precedent</u>

A threshold inquiry in ex post facto analysis is whether the parole guidelines being challenged are even a "law" for purposes of the Ex Post Facto Clause.  As Magistrate Judge Lenihan noted in the remand order, most courts of appeals have held that parole guidelines are per se not "laws" to which the Ex Post Facto Clause applies.  Memorandum Order of October 24, 2005, p. 1.  However, in <u>United States *ex rel.* Forman v. McCall</u>, the Third Circuit held that in order to determine whether or not the federal parole guidelines prescribed by 18 U.S.C. §4203(a)(1) were "laws," the court would need to examine "whether the guidelines in fact are applied with 'substantial flexibility.'" 776 F.2d at 1160.  The court considered statistical evidence of the Commission's decision-making under the challenged guidelines, and held that because the Commission departed as a matter of discretion from the guidelines in about 25% of cases, the guidelines were being applied with "substantial flexibility," and therefore were not "laws" for purposes of the Ex Post Facto Clause.  <u>Id</u>. at 1163.  Accordingly, because the federal guidelines were not "laws," their retroactive application, even if to the detriment of the prisoner, would not violate the Ex Post Facto Clause.  <u>See</u>

11

Forman, 776 F.2d at 1158 (three part analysis: measure would be ex post facto if 1) retrospective, 2) detrimental, and 3) a "law" for purposes of Ex Post Facto Clause).

Petitioner's ex post facto claim, as framed by him, is that the Commission violated the Clause by applying the 2000 rather than the 1998 version of 28 C.F.R. §2.80 at his 2003 hearing. This claim must be dismissed for failure to state a cognizable ex post facto claim. It is settled that the "law annexed to the crime" for purposes of ex post facto analysis is the law in effect at the time of the offense. See, e.g., Forman, 709 F.2d at 856 ("It is a fundamental principle of ex post facto jurisprudence that a court entertaining an ex post facto claim must focus upon the law in effect at the time of the *offense* for which a person is being punished," rejecting ex post facto argument focused on parole scheme in effect at time of sentencing); Lightsey v. Kastner, 846 F.2d 329, 333 (5th Cir. 1988), cert. denied, 448 U.S. 1015 (1989) (relevant law for ex post facto analysis is law in effect on the date the offense was committed). Petitioner committed his offense prior to his sentencing in 1995 (Supp. App. 74, Sentence Monitoring Computation Data). Therefore, the rule he wants applied in his case, the 1998 version of §2.80,[12] cannot be considered the law annexed to his crime. Forman, 709 F.2d at 857. Petitioner cannot demonstrate a constitutional right to application of the 1998 regulation in his case.

## II.    THE 2000 GUIDELINES ARE NOT "LAWS" FOR PURPOSES OF EX POST FACTO BECAUSE THEY ARE APPLIED WITH SUBSTANTIAL FLEXIBILITY.

Assuming, arguendo, (see argument, infra) that the "substantial flexibility" analysis of Forman is applicable in this case dealing with guidelines promulgated under the District of Columbia parole statute, statistical evidence demonstrates that the Commission is applying the 2000 guidelines

---

[12]    See 28 C.F.R. Appendix §2.80 (2001); (Supp. App. 128-130, 7/1/02 Edition with Appendix).

with substantial flexibility, so they are not "laws" for purposes of the Ex Post Facto Clause.

In response to this Court's order, the Commission's Research Administrator, James L. Beck, Ph.D., undertook a research study to examine the Commission's application of the 2000 guidelines. He examined all cases in which D.C. Code offenders were released on parole between January 1, 2005 and October 27, 2005 with the application of the 2000 guidelines, n=98 cases.  See Declaration of James L. Beck (hereinafter "Beck Declaration"), attached hereto as Exhibit A.  He found that in 38% of the cases (37 cases), the Commission granted a parole date within the guideline range, and in 9% of cases (9 cases), the Commission made a discretionary decision to exceed the guideline range.   Beck Declaration, pp. 1-2.  The remaining cases in the sample were split between "non-discretionary" decisions above the guidelines (36 cases, 37%),[13] non-discretionary decisions below the guideline range (10 cases, 10%)[14] and cases in which the Commission exceeded the guidelines solely to allow time for release planning (6 cases, 6%).[15]  See Beck Declaration.

In Forman, there was extensive argument about which types of decisions were properly considered when evaluating the guidelines for flexible application.  The court held that "cases in

---

[13]  These cases were those in which the prisoner had already served to or above the top of the guideline range at the time of his hearing, due to the length of the minimum term the court had imposed (or because the prisoner had delayed applying for parole), and those in which the prisoner's parole eligibility date was greater than the top of the guideline range.

[14]  These cases were those in which the Commission ordered the prisoner to serve to the expiration of his sentence, yet this decision resulted in time-in-custody that did not reach the minimum of the guideline range.

[15]  In none of the cases in the sample (0%) did the Commission depart below the guideline range.  This is not surprising, because departures below the guidelines are impossible in cases in which the "months to eligibility" is the sole factor determining the prisoner's guideline range (i.e., cases in which the prisoner's "base point score" is 3 points or less, so that his "base guideline range" to which the "months to eligibility" range is added is zero points, and in which there were no institutional infractions to increase the range.)  See 28 C.F.R. §2.80(h) and (j), and Beck Declaration, p. 2.  This is because the prisoner becomes eligible to parole release at the same number of months which represent the top of the guideline range, and the Commission lacks authority to release a prisoner before he has served his "months to eligibility."  The Commission is therefore precluded from rendering a below-guidelines decision in this type of case.

13

which the Commission was precluded from exercising its usual latitude by reason of a maximum sentence shorter than the inmate's computed guideline range or a minimum sentence longer than the range" should be excluded from the sample, as they did not represent an actual exercise of discretion by the Commission. 776 F.2d at 1162. The court held that the cases in which the Commission had ordered service to the expiration of the sentence, which had nonetheless resulted in a decision below the guideline range, should be excluded from the sample as not representing an exercise of discretion. Id. at 1163 ("below CTE" cases excluded from sample). The court also excluded from the sample cases in which "a long minimum sentence precludes the Commission from setting a release date within or below the guidelines." Id. ("above MJS"–minimum judicial sentence–cases excluded from sample).

In this case, following the logic of the Forman court, the categories Dr. Beck described as "non-discretionary decisions above the guidelines" (36 cases, 37%) and "continued to expiration below the guideline range" (10 cases, 10%) must be excluded from the sample. As the Third Circuit held in Forman, in "cases in which the Commission was precluded from exercising its usual latitude by reason of a maximum sentence shorter than an inmate's computed guideline range or a minimum sentence longer than the range":

> [T]hese decisions have almost no significance for the inquiry before the court. For example, where a long minimum sentence precludes the Commission from setting a release date within or below the guidelines, we have no way of knowing the decision which the *Commission* (emphasis original) would have rendered based on its evaluation of the relevant factors. In such a case, the Commission is robbed of any discretion to choose among the "within," "above," and "below categories. All we can know from the data is that the Commission decided not to depart even further from the guideline range than required by the minimum sentence. Similarly, when the maximum sentence falls below the computed range, we can discern from a Commission decision only its judgment whether it was

14

> appropriate to go even further below the guideline range.
>
> * * *
>
> We therefore hold that as a matter of law, these categories of
> anomalous decisions should have been excluded from consideration
> on the issue of substantial flexibility.

776 F.2d at 1162-63.

In this case, the comparable categories which are excluded as a matter of law are those Dr. Beck coded as "non-discretionary above" and "CTE below." These two categories of cases together account for 47% of the sample (46 cases of 98). Excluding these two categories of cases, the evidence shows that the Commission has departed from the 2000 guidelines in 17% of cases (9 cases out of 52). Furthermore, Dr. Beck's description of the 6 cases in the category of "release planning" makes clear that those cases also do not, for the most part, represent exercises of discretion by the Commission: in all but one, the prisoner had already served within 2 months of the top of the guidelines at the time of his hearing, limiting the Commission's options. Beck Declaration, p. 2. If these cases are also excluded from the sample, the Commission's rate of departures from the guidelines rises to 20% (9 cases out of 46).

As the United States District Court for the District of Columbia held in Allston v. Gaines, 158 F.Supp. 76 (D.D.C. 2001), applying the "analytical framework announced by the Third Circuit," a departure rate by the Commission of 20% (when applying the 1998 version of the D.C. guidelines) "is sufficient to show that the Parole Commission retains significant discretion under the guidelines" to constitute "substantial flexibility." Id. at 83. The difference between a low estimate of 17% departures and a high estimate of 20% departures is not so significant that this Court can reasonably conclude that while 20% departure would constitute "substantial flexibility," a 17% departure rate would not constitute "substantial flexibility." Accordingly, the evidence supports a finding, and the

15

Court should hold, that the Commission has applied the 2000 guidelines with substantial flexibility, and that they are therefore not "laws" for purposes of ex post facto analysis.

To the extent that the court examines petitioner's claim as presented by him, it would fail because neither the 1998 guidelines nor the 2000 guidelines are "laws" for purposes of ex post facto analysis. Cf. Allston, supra. Accordingly, the Ex Post Facto Clause would not entitle him to application of the 1998 rather than the 2000 guidelines.

## III.   THE "SUBSTANTIAL FLEXIBILITY" ANALYSIS OF FORMAN IS INAPPLICABLE TO THE D.C. PAROLE GUIDELINES PROMULGATED UNDER THE D.C. PAROLE STATUTE.

In Forman, the Third Circuit's determination that the federal parole guidelines could potentially be "laws" arose from the particular provisions of the federal parole statute. Specifically, the court found that "Adult Guidelines for Parole Decisionmaking" (i.e., the federal parole guidelines) could potentially be "laws" because: [u]nbounded discretion probably does not exist in the Commission's [federal] decisionmaking; the [federal] guidelines provide perimeters that may be overstepped only upon a showing of good cause, see 18 U.S.C. §4206(c)(1976), and changes in the guidelines appear to shape the exercise of that discretion. 776 F.2d at 1159-60 (emphasis added). In short, Forman does not stand for the proposition that any set of parole guidelines under any parole statute must be "flexible" in order to escape being characterized as a "law" for ex post facto purposes. Rather, the "substantial flexibility" requirement arose particularly from the precise language of the federal parole statute which permitted departures from the guidelines only upon a showing of "good cause", and from the fact that the federal statute did not grant "unbounded discretion." Id.

Respondent posits that the "substantial flexibility" approach that the Forman court took to

the federal parole guidelines is simply not applicable to the guidelines for D.C. Code offenders at issue in this case, because the "substantial flexibility" test arose out of the particulars of the federal parole statute, and the D.C. parole statute is fundamentally and materially distinct.[16] The "substantial flexibility" test is an artifact of the <u>federal</u> parole statute's particular language, and it should not be extended to the <u>D.C.</u> parole statute, because that statute does in fact grant "unbounded discretion" to the paroling authority.

The D.C. parole statute is materially different from the federal parole statute in two crucial respects. First, unlike the federal parole statute, the D.C. parole statute makes parole entirely discretionary with the paroling authority (formerly the D.C. Board of Parole, now the U.S. Parole Commission). See <u>Duckett v. U.S. Parole Commission</u>, 795 F.Supp. 133, 135 (M.D.Penn. 1992) (Consistent with this statutory provision [the D.C. parole statute], which contains no mandatory language requiring parole once certain conditions are satisfied, it has been held that the District of Columbia Board of Parole has broad authority over parole decisions and judicial review is limited to whether the Board acted arbitrarily or capriciously or abused its discretion) (emphasis added).

---

[16] By way of background, the parole decisions of the U.S. Parole Commission in the cases of D.C. Code offenders are made pursuant to the D.C. parole statute, D.C. Code §24-404, not the federal parole statute. <u>See</u> D.C. Code §24-131(c)("The Parole Commission shall exercise the authority vested in it by the section pursuant to the parole laws ... of the District of Columbia... .") The D.C. parole statute provides that:

(a) Whenever it shall appear to the Board of Parole that there is a reasonable probability that a prisoner will live and remain at liberty without violating the law, that his release is not incompatible with the welfare of society, and that he has served the minimum sentence imposed or the prescribed portion of his sentence, as the case may be, the Board <u>may</u> authorize his release on parole upon such terms and conditions as the Board shall from time to time prescribe. * * *

D.C. Code §24-404 (formerly §24-204).

The Commission's authority to "amend and supplement" the D.C. parole regulations, which authority it exercised to promulgate the 2000 guidelines, derives from District of Columbia law. D.C. Code §24-131(a)(1)("The Parole Commission shall have exclusive authority to amend or supplement any regulation interpreting or implementing the parole laws of the District of Columbia . . ..")

Numerous courts interpreting the D.C. parole statute have held that the statute does not create a

liberty interest for purposes of due process precisely because it gives such broad discretion to the

paroling authority.  For example, in Ellis v. District of Columbia, 84 F.3d 1413 (D.C. Cir. 1996), the

court stated that:

> We held in Price v. Barry, 53 F.3d 369 (D.C. Cir. 1995)(per curiam),
> that [D.C. Code §24-204(a)] created "no 'expectancy of release'
> entitling a prisoner to due process protections." Id. at 371.  Our
> reasoning was straightforward and rested on the language of §24-
> 204(a): even if a prisoner established everything the statute required,
> the Board of Parole still had discretion to deny parole.

84 F.3d at 1415.  The court then held that the 1987 D.C. parole guidelines also did not create a

liberty interest.  Id. at 1419 (rejecting finding of district court that "the numerical scores provided

by the [1987 D.C.] regulations 'effectively determine[ ] the parole decision.'").  See also, McRae v.

Hyman, 667 A.2d 1356, 1361 (D.C. App. 1995)("[T]he District's parole scheme does not create...a

liberty interest in the granting of parole."); Blair-Bey v. Quick, 151 F.3d 1036, 1047 ( D.C. Cir.

1998)(neither the Constitution nor the D.C. regulations create a liberty interest in parole).

In contrast, the federal parole statute uses mandatory language ("shall"), compelling release

of a prisoner on parole if the Commission makes certain determinations: that release of an eligible

prisoner would not depreciate the seriousness of the offense nor promote disrespect for the law, and

that such release would not jeopardize the public welfare.  18 U.S.C. §4206(a). The federal parole

statute, unlike the D.C. parole statute, does create an "expectancy of release" sufficient to bestow

a liberty interest on federal prisoners subject to it.  See, e.g., Solomon v. Elsea, 676 F.2d 282 (7th Cir.

1982)(federal parole statute creates liberty interest); Evans v. Dillahunty, 662 F.2d 522 (8th Cir.

1981)(same).

Furthermore, as the Third Circuit found crucial in Forman, the federal parole statute only

permits the Commission to exceed the applicable parole guideline range upon a finding of "good cause." 776 F.2d at 1159-60. Therefore, the federal parole statute being interpreted in Forman differs fundamentally from the D.C. parole statute because it grants circumscribed discretion to the Commission as compared to the virtually unbounded discretion granted by the D.C. law. Cf. Duckett, 795 F.Supp. at 135.

Second, unlike the federal parole statute, the D.C. parole statute does not mandate that parole guidelines be developed. Compare 18 U.S.C. §4203(a)(1)("The Commission ... shall (1) promulgate rules and regulations establishing guidelines for the powers enumerated in subsection (b) of this section and such other rules and regulations as are necessary to carry out a national parole policy ...") with D.C. Code §24-201a et seq. (copy attached hereto as Exhibit B) ("The Board of Parole shall select its own Chairman and shall have the power to establish rules and regulations for its procedure").[17] In this regard as well, the federal parole statute being interpreted in Forman differs fundamentally from the D.C. parole statute, because it compelled the development of guidelines. In contrast, the D.C. statute granted unbounded discretion to the Board, which courts subsequently held was not in any way constrained by the Board's development of discretionary guidelines. Blair-Bey v. Quick, 151 F.3d 1036, 1047-48 (D.C. Cir. 1998)("We agree that so discretionary an open-ended a document [as the 1987 guidelines] cannot be construed to give rise to a liberty interest); McRae v. Hyman, 667 A.2d 1356 (D.C.1995) (1987guidelines do not create liberty interest overriding the discretion they confer); Ellis, supra.

---

[17] The District of Columbia recently recodified its criminal laws; the parole statute which was formerly §24-201 et seq. is now found at §24-401 et seq. In addition, the District repealed some provisions of the parole statute. Accordingly, for purposes of demonstrating that the D.C. parole statute did not compel the Board to develop guidelines, respondent submits a copy of the older unrepealed parole statute that was in effect when the D.C. Board promulgated its guidelines in 1987.

In sum, unlike the federal parole statute, the D.C. parole statute <u>does</u> create basically unbounded discretion in the paroling authority. <u>See</u> cases cited <u>supra</u>. Given that the Court based its requirement for a showing of "substantial flexibility" in <u>Forman</u> on the absence of unbounded discretion under the federal parole statute, 776 F.2d at 1159-60, the <u>Forman</u> analysis would appear to be inapplicable to the D.C. parole statute, under which the Commission's discretion is enormous and no "good cause" showing for departure from the guidelines is necessary.

Respondent therefore urges the court to hold that the <u>Forman</u> analysis does not apply in this case because the D.C. statute at issue is fundamentally different from the federal statute at issue in <u>Forman</u>, and the concerns that led that court to require "substantial flexibility" in analyzing guidelines under the federal statute do not arise under the D.C. parole statute. The petition should be dismissed on the basis that the 2000 guidelines promulgated under the D.C. statute are per se not "laws" for purposes of Ex Post Facto Clause.

## IV.    PETITIONER CANNOT MEET HIS BURDEN TO SHOW THAT THE 2000 GUIDELINES CREATE A "SIGNIFICANT RISK" OF INCREASED INCARCERATION AS COMPARED TO THE 1987 GUIDELINES.

Even assuming, <u>arguendo</u>, that the 2000 guidelines are "laws" for purposes of ex post facto analysis, they do not create a significant risk of incarceration as compared to the 1987 guidelines. Therefore, their retroactive application would not violate the Clause because there would be no increase in punishment.

Petitioner bears a heavy burden on this question. The Supreme Court stated in <u>Garner v. Jones</u>, 529 U.S. 244, 255 (2000) that a prisoner challenging a change in parole regulations as ex post facto "must show that as applied to his own sentence the law created a significant risk of increasing his punishment." Petitioner has failed to meet this burden.

Petitioner makes three allegations regarding the effect of application of the 2000 guidelines. First, he claims that, as compared to the 1998 guidelines, they would place him in a higher total guideline range. <u>See</u> Traverse, p. 5. This allegation is without merit. To the contrary, as the Commission explained in the Federal Register when it promulgated the 2000 guidelines, they were designed and intended precisely to create a total range of months that would mimic the number of months the prisoner would have served under the 1998 guidelines: "[t]here is no change from the Base Point Score used in [the 1998 rule]. The time expected for the inmate to qualify for parole (assuming no disciplinary infractions and ordinary program achievement) is simply made explicit." 65 Fed. Reg. at 70663. As the court noted in <u>Allston</u>, it is misleading to simply compare the guideline range under the 1998 guidelines to the range under the 2000 guidelines, because under the former the range is merely the number of months to be served until the next hearing, while under the latter the range represents the total number of months to be served in prison. <u>Allston</u>, 158 F.Supp.2d at 83 (emphasis original)(citation omitted). Petitioner's first allegation of increased punishment must therefore be rejected.

Second, Petitioner argues that he will not be paroled under his 2000 guidelines range (185-217 months), while under the prior guidelines he would have been subject to a range of 12-18 months. Petitioner's Objections to Magistrate's Report, p. 2. Again, this is a comparison of apples and oranges, because the 12-18 month range is only the time to a rehearing, not the time to be served prior to parole release. <u>Allston</u>, <u>supra</u>. Petitioner cannot show that he would have been released on parole under the prior guidelines.

Third, petitioner argues that the 2000 guidelines are more onerous because they "permit the Parole Commission to set a release date and/or rehearing date beyond rather than within the initially

(first) applicable guideline range." <u>Id</u>. However, as noted below, departures from the guidelines were permissible under the 1987 and the 1998 guidelines, according to the same broad discretionary standard.

The Commission's discretion to depart from the guideline range is the same as that exercised by the District of Columbia Board of Parole, because the Commission renders its decisions under the same statute – D.C. Code §24-404 – under which the D.C. Board rendered its decisions. Furthermore, the language of the paroling authorities' respective regulations authorizing departures (from the 1987 guidelines and the 2000 guidelines) is virtually identical. <u>Compare</u> 28 D.C.M.R. §204.22 (repealed)(<u>quoted</u> in <u>Ellis</u>, 84 F.3d at 1416 n.2) <u>with</u> 28 C.F.R. §2.80(n)(1). Petitioner has failed to demonstrate that the 2000 guidelines result in a materially harsher result than the 1987 guidelines would have.

Furthermore, given the Board's very broad discretion to exceed its guidelines, Petitioner simply cannot demonstrate what his parole result would have been under the 1987 guidelines. At best, he can show what the guidelines would have called for in the "ordinary case," but he cannot show that the Board would have considered his case to be an "ordinary case" warranting parole release within the guidelines. (Petitioner cannot even demonstrate that the Board was likely to have considered his case "ordinary" and granted parole within the guidelines.) As the Supreme Court noted in <u>Garner</u>:

> We do not accept the Court of Appeals' supposition that [the Georgia parole rule at issue] "seems certain" to result in some prisoners serving extended periods of incarceration. The standard announced in <u>Morales</u> requires a more rigorous analysis of the level of risk created by the change in law. When the rule does not by its own terms show a significant risk, the respondent must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive

application will result in a longer period of incarceration than under the earlier rule. * * * In the case before us, respondent must show that as applied to his own sentence the law created a significant risk of increasing his punishment.

Without knowledge of whether retroactive application of the amendment [to the Georgia parole rule] increases, to a significant degree, the likelihood or probability of prolonging respondent's incarceration, his claim rests upon speculation.

Id. at 255-56 (emphasis added)(citations omitted).

Petitioner cannot show that the 2000 guidelines are "facially more onerous" than the 1987 guidelines. See Glascoe v. Bezy, 421 F.3d 543, 547 (7th Cir. 2005)(holding 1999 guidelines not "facially more onerous" than 1981 guidelines, because both sets of guidelines apply the same parole statute, and the later guidelines "consider many of the same factors as the earlier guidelines, including the nature of the underlying offense and institutional behavior," with "the later guidelines quantify[ing] these factors" while "preserving the discretion of the parole decision-making body"). As in Glascoe, in this case the two sets of guidelines at issue (1987 and 2000) both apply the same parole statute (D.C. Code §24-204), and both consider the same factors (SFS, characteristics of offense behavior including use of weapon and death of victim, and institutional behavior both positive and negative).[18] The 2000 guidelines were intended by the Commission to "quantify" the

_____

[18] Under the 1987 guidelines, an initial point score was derived from computation of the SFS (a SFS score of between 8 and 10 yielding a point score of +0, of 6 or 7 yielding +1, of 4 or 5 yielding +2 and of between zero and 3 of +3 points). Points could then be added to this starting point score if the offense involved violence, weapons or drug trafficking, as well as for negative institutional behavior. 28 D.C.M.R. §204.4 (salient factor score); §204.17 (conversion of SFS to a point score) and §204.18(additional points based on offense factors and institutional behavior). See discussion of 1987 D.C. parole guidelines in Ellis, supra, at 1415-17. Under this system, a prisoner received his initial hearing a few months before satisfaction of his minimum term, so the "months to parole eligibility" factor was considered in the guidelines by not making the guidelines applicable until after the prisoner had already served his months to eligibility. 28 D.C.M.R. §200.1 ("[T]he Board shall be authorized to release a prisoner on parole in its discretion after he or she has served the minimum term ...") and 28 D.C.M.R. §202.1 ("The Board shall permit an individual serving a sentence in which the minimum term is or exceeds three (3) years to file an application for parole six (6) months prior to the actual eligibility date. The Board shall then conduct a parole hearing.")

Under the 2000 guidelines, a base point score is derived from a virtually identical SFS to that used under the

factors considered under the 1987 guidelines. See 65 Fed. Reg. at 706633. Accordingly, the 2000 guidelines cannot be considered "facially more onerous" than the 1987 guidelines. This means that under <u>Garner</u> petitioner must demonstrate that the 2000 guidelines create a "significant risk of increased punishment" <u>for him</u>. <u>Glascoe</u>, 421 F.3d at 547.

In <u>Glascoe</u>, the court noted that under <u>Garner</u> this inquiry "is not to be confused with the question of whether the new parole practice is harsher for a class of prisoners generally; we must focus on the consequence of the new practice on the sentence of the particular inmate bringing the challenge." 421 F.3d at 548 (<u>citing</u> <u>Garner</u>, 529 U.S. at 255). Petitioner has failed to meet his burden to demonstrate a "substantial likelihood of increased punishment" from application of the 2000 guidelines rather than the 1987 guidelines <u>in his case</u>. His ex post facto claim must therefore be dismissed.

Furthermore, because of the Board's unbounded discretion, Petitioner's hypothetical parole decision under the 1987 guidelines is unknowable with any degree of likelihood. Therefore, because the discretion of the D.C. Board under the 1987 guidelines was so broad and open-ended, petitioner cannot make the requisite showing that the application of the 2000 guidelines "will result in a longer period of incarceration than under the previous [1987] guidelines." Order of October 19, 2005, p. 2. There is no showing that petitioner could make which would meet his burden of proof on the question of "substantial likelihood of increased punishment," because of the completely speculative nature of any representation he may make about what the parole decision under the 1987 guidelines

---

1987 guidelines, and points can be added for violence in the current offense or in prior offenses, as well as for death of a victim or "high level violence". 28 C.F.R. §2.80(f). The score resulting from this calculation is then converted to a range of months (the "base guideline range"), to which and additional range can be added for negative institutional conduct. A range for "months to eligibility" is also added (albeit, the prisoner has already served these months by the time of the hearing). §2.80(l).

would have been. <u>Cf</u>. <u>Glascoe</u>, 421 F.3d at 549 ("It is only remote speculation to suggest that the application of the [1999 guidelines] in [the prisoner's] case will increase his punishment"). Petitioner cannot meet his burden of proof, and the ex post facto claim must therefore be dismissed.

**CONCLUSION**

For the foregoing reasons, the petition for habeas corpus should be denied and the case dismissed.

Respectfully submitted,

MARY BETH BUCHANAN
United States Attorney

 s/ Christy Wiegand
Christy Wiegand
U.S. Courthouse and Post Office
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 644-3500

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served this date a copy of the within *Response*, by mail or electronic filing, upon the following:

Michael W. Hill
Reg. No. 40428-133
FCI Gilmer
PO Box 6000
Glenville, WV 26351


s/ Christy Wiegand
CHRISTY WIEGAND


Date: December15, 2005